THE ANGLO–PATAGONIAN.

(District Court, E. D. Virginia. December 14, 1915.)

1. SHIPPING ⬦84—LIABILITY FOR INJURIES SUSTAINED BY DRY-DOCK EM-
PLOYÉS.

Employés of a dry dock while making repairs on a ship were injured
by the fall of the starboard anchor, which was swinging in the usual way
out of the hawse pipes. The dry-dock company had nothing to do with
the ship except to make the repairs, and the ship was under the con-
trol and direction of her master and crew. Held, that the anchor was a
part of the ship's appliances and under her control, and for damages
caused by the falling thereof by reason of insecure fastening or imper-
fections in connection with its construction, the ship as between her-
self and the dry-dock employés, was liable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351;
Dec. Dig. ⬦84.]

2. SHIPPING ⬦84—LIABILITY FOR INJURIES SUSTAINED BY DRY-DOCK EM-
PLOYÉS.

It was the duty of the ship, in view of the fact that the workmen were
working immediately beneath the swinging anchor, to take no chances
and see that a safe course was adopted, and, whether the slipping of the
anchor was due to weight upon the brake band holding it, or to vibration
or jar caused by the work of repairs, or to its actual loosening by some
person, the ship was liable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351;
Dec. Dig. ⬦84.]

3. DAMAGES ⬦132—PERSONAL INJURIES—AMOUNT.

A riveter and boiler maker 40 years old, who had worked in a ship-
yard for 15 years, was married, and had six children, and had been mak-
ing from $20 to $25 a week, sustained injuries permanent in character,
consisting of a dislocation of his right shoulder, a fracture of the upper
part of his arm, a broken ankle, and partial paralysis of the right arm.
He was in the hospital 8 weeks and operated on 3 times, and still was
being treated daily. He had partially recovered and had a good-holding
arm, but could not again work as a riveter and boiler maker. Held
that an allowance of $7,000 would be proper.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396;
Dec. Dig. ⬦132.]

4. DAMAGES ⬦132—PERSONAL INJURIES—AMOUNT.

A colored foreman rigger, who had worked 7 years in a shipyard, was
married, and had two children, had his left leg crushed so as to require
amputation, and was in the hospital 7 weeks. He had been earning
about $2.50 a day with some extra work, his average weekly pay being
from $18 to $25, and his earnings for the year preceding the injury $947.
Subsequent to the injury he was working as a passer at $15 a week, but
there was no such regular position as passer. Held, that an award
of $5,500 would be proper compensation.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396;
Dec. Dig. ⬦132.]

5. DAMAGES ⬦131—PERSONAL INJURIES—AMOUNT.

An employé in the fitter's department of a shipyard, who was married
and had one child, had worked in the shipyard 8 years, and was earning
$12 a week, sustained injuries, consisting of a fracture of the left thigh
and other bruises. He was in the hospital 14 weeks and was still under
treatment. The fractured limb would probably recover in three or four
months more. His arm was also seriously injured, and the extent of

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the injury could not be fully determined. *Held*, that an allowance of $4,000 would be reasonable.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 357–367, 370; Dec. Dig. ☞131.]

6. DEATH ☞99—INJURIES CAUSING DEATH—DAMAGES—AMOUNT.

A colored laborer in a shipyard, 25 years old and earning about $12.75 a week, sustained injuries from which he died. He left surviving a mother 55 years old, to whom he had been giving $5 a week for the support of the home. *Held*, that an award of $2,000 to the mother would be reasonable, in view of her age, and what she had and probably would have received from deceased.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. ☞99.]

7. DAMAGES ☞131—PERSONAL INJURIES—AMOUNT.

Where an employé in a shipyard sustained slight injuries detaining him from work about 3 weeks, after which he was regularly at work, a nominal allowance of $100 would be proper.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 357–367, 370; Dec. Dig. ☞131.]

In Admiralty. Three libels by William Ledwitch and others, by Enoch Spratley, and by R. D. Smith, administrator of William Byrd, deceased, against the British steamship Anglo-Patagonian. Decree for the libelants.

Allen D. Jones and J. Thomas Newsome, both of Newport News, Va., and William A. Graff, of Norfolk, Va., for libelants.

Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge. These are three libels filed to recover damages growing out of one accident, all dependent upon the same facts, and which, for convenience, and by consent of counsel, are heard together.

On the 2d day of June, 1915, the steamship Anglo-Patagonian was placed in dry dock at Newport News, Va., for the purpose of having repairs made to her stem, necessitated by a collision shortly theretofore sustained in Hampton Roads. The ship was placed upon the ways, resting upon keel blocks and bilge blocks, and the shipyard authorities thereupon erected a wooden framework on the outside of the ship, necessary to make the repairs; stages were swung from the bows of the ship, with a view of taking off the old plates in and about said bows, and attaching new plates; that such staging under the starboard bow was swung on ropes running up to the deck, and there made fast to the rear of the staging, the forward end of the staging resting upon crossbeams supported by two uprights, which uprights were lashed to the ship, the ends thereof fastened to the bow of the ship. On the 5th day of June, about 11:30 o'clock in the forenoon, the libelants while on said staging and at work on the repairs to the ship, were thrown therefrom to the bottom of the dock, by reason of the starboard anchor of the ship dropping from the hawse pipe upon and striking the staging with great violence, tearing the same to pieces, causing the injuries sued for. The ship, while in the dry dock, continued under the control and direction of her master and crew, and they remained thereon. The Dry

Dock Company had nothing to do with the ship save make the repairs to her stem, as hereinbefore stated. At the time of entering the dry dock, and during the making of the repairs, the ship had her anchors swung in the usual way out of the hawse pipes; and the giving way or releasing the brake band holding the starboard anchor precipitated it violently upon and destroyed the framework around the ship's bow, and these proceedings were instituted to recover damages for injuries sustained by the libelants, respectively, therefrom.

The damage to the ship's stem and bow, which apparently had not been injured or affected by the previous collision, was at a point considerably below the hawse pipe. The libelants insist that the injuries were received solely because of the failure of the ship to properly make fast her anchor, and to have and maintain proper instrumentalities for that purpose; whereas, the ship contends that she had fully discharged her duty in this respect; that the ship's windlass was of the Clark and Chapman type, one of the well-recognized makes of anchor construction, and in general use; that this anchor contained the necessary and proper anchor brake band, as well as a compressor, or chain stopper, all of which were in proper condition; that at and before the accident, her anchor was made fast by the hand brake, which was amply sufficient for the purpose, and the accustomed way of making fast anchors while in port, and that its compressors, or chain stoppers, were not being used because it was only necessary to use the same in stress of weather and at sea; that immediately after the accident, it was found that the spindle or clutch had been slightly turned or loosened, which caused it to give way, and that this was done, not by the ship, or any of its employés, or those for whom she was responsible, but resulted either from vibration incident to the repairs then being made, or the act of some of the shipyard employés for whom they were not responsible. Libelants insist, nevertheless, that the ship is responsible for the falling of the anchor, whether the same was caused by reason of the insecure fastening thereof, the improper releasing of the same, or the failure to make it entirely safe by the use of the compressor or chain stopper then at hand. They further contend that a devil's claw, with which the windlass was not equipped, would have made the anchor even more secure than the compressor or chain stopper, and that the latter appliance, with which the ship was equipped, was upon inspection, found to be out of order.

[1] The case turns entirely upon whose fault it was, if that of any one, that the anchor gave way, causing the injuries complained of. The anchor was undoubtedly part of the ship's appliances, and under her control, and for damages arising from the falling of the same, by reason of insecure fastening or imperfections in connection with its construction, the ship clearly, as between herself and these libelants, is liable. The ship insists that it was not necessary for her to do more than properly make the anchor fast in the hawse pipe, by the brake band of the windlass; that that was the universal custom when in port and in dry dock in this country, though in Europe it was customary to lower the anchor to the bottom of the dock, when in dry dock.

[2] It seems to the court that the test of the sufficiency of what the

ship did in this case should be determined in the light of the result that followed. She confessedly did not adopt the safe method of holding her anchor, having regard to the injury to her stem; and the fact that workmen were engaged in its repair immediately beneath the swinging anchor required that she should have taken no chances, and, on the contrary, seen that a safe course was adopted. Doubtless it was believed that the brake band was sufficient, but the element of doubt or hazard entered into that, arising either from its failure to hold from any cause, or from some one interfering with or loosening the same, which the ship says was done in this case. Whether the weight upon the brake band allowed the anchor to slip, or vibration or jar from the work going on, on the ship beneath the anchor, or the actual loosening of the same by some person caused it, is immaterial. The ship took chances of all this, certainly as between herself and these libelants, when she permitted an appliance and instrumentality of the character in question to be used without properly safeguarding the same, and she cannot escape liability either by insisting that what she did was sufficient, or that others, as well as herself, may have been in part responsible for what occurred. Upon the whole case, in the judgment of the court, it is clear that as between the ship and these libelants she is responsible for the injuries sustained by the latter, because of the failure to have, use, and maintain a safe appliance to protect against the running, slipping, or giving way of the anchor which caused the damage sued for.

This leaves for determination the amount of damages to be awarded to the several libelants, which presents more than usual difficulty, by reason of the fact that the persons injured are not of the same grade of employment, and different considerations necessarily enter into the ascertainment of the amounts to be allowed.

[3] 1. Edward Ledwitch, white, age 40 years, by trade riveter and boiler maker, making from $20 to $25 per week; married, six children; worked in shipyard 15 years. Injuries received permanent in character, consisted of dislocation of right shoulder, fractured upper part of arm, broken ankle, partial paralysis of right arm due to injury of nerve trunks; in hospital 8 weeks, operated on three times, and still has to be treated daily; has partially recovered, and has now a good-holding arm, but cannot work as a riveter and boiler maker again. For his injuries, an allowance of $7,000 is made.

[4] 2. Edward Pressey, colored, age 35, married, two children, a foreman rigger; 7 years in shipyard, earning about $2.50 a day, and extra work; average weekly pay $18 to $25. Injuries, left leg crushed and amputated; not injured otherwise; in hospital 7 weeks. Now doing work as a passer, that is, where he can sit down and give signals to others; but there is no such regular position as a passer. Is getting in this temporary place $15 a week. Last year made $947 as foreman rigger. In this case, the court thinks an award of $5,500 proper compensation.

[5] 3. Peter Johnson, white, aged 38 years, married, one child, in fitter's department, earning $12 a week. Worked at shipyard 8 years. Injuries consisted of fracture of left thigh, and other bruises; in hospital 14 weeks, and still under treatment; fractured limb will probably

recover in three or four months yet to come. Serious injury to arm. the extent of which cannot be fully determined now. In this case, an allowance of $4,000 is deemed reasonable.

[6] 4. William Byrd, colored, aged 25 years, a laborer in shipyard, earned about $12.75 a week; left surviving him a mother 55 years old, to whom he had given $5 a week for the support of the home; died in a few hours after the injury. In this case, an award of $2,000, payable to his mother, is believed to be reasonable under all the circumstances, taking into account the age of the mother, and what she received, and probably would have received from the deceased.

[7] 5. Enoch Spratley, colored, sustained slight injuries which detained him from work some 3 weeks; now regularly at work. Only a nominal allowance should be made him, say $100.

A decree will be entered in favor of the several libelants against the respondent steamship for the amounts hereinbefore set forth on presentation.